UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



HANAD ABDI and JOHAN BARRIOS RAMOS,

               Petitioners,

     v.

ELAINE DUKE, in her official capacity as
Acting Secretary of U.S. Department of
Homeland Security; THOMAS BROPHY, in his
official capacity as Acting Director of Buffalo
Field Office of Immigration and Customs
Enforcement; JEFFREY SEARLS, in his official
Capacity as Acting Administrator of the Buffalo
Federal Detention Facility; and JEFFERSON
SESSIONS, in his official capacity as Attorney
General of the United States,

               Respondents.

**DECISION AND ORDER**

1:17-CV-0721 EAW

## **INTRODUCTION**

Petitioners Hanad Abdi and Johan Barrios Ramos (collectively, "Petitioners") came to the United States seeking asylum. The federal government has determined that they are likely to win the right to remain in the United States due to a credible fear of returning to their homelands because of a significant possibility of persecution or torture in those countries. Upon their arrival at the U.S. border, they were taken into custody, transported to the Buffalo Federal Detention Facility in Batavia, New York, and held without parole or a bond hearing for more than nine months. Petitioners seek relief on behalf of themselves individually and on behalf of the putative class members of similarly situated asylum-seekers being held in Batavia.

- 1 -

Respondents moved to dismiss this lawsuit pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that the Court lacks subject matter jurisdiction over the claims and that Petitioners have failed to state a viable claim for relief. (Dkt. 27). Petitioners oppose dismissal and seek a preliminary injunction on behalf of themselves and the members of the putative class. (Dkt. 38). While acknowledging that the ultimate parole decision is a discretionary determination not subject to judicial review, Petitioners seek preliminary injunctive relief requiring procedural safeguards when adjudicating parole. Petitioners also seek preliminary injunctive relief requiring individualized bond hearings for any detention that lasts longer than six months.

Because this Court has subject matter jurisdiction over the claims and Petitioners have stated valid claims, the Court denies Respondents' motion to dismiss. (Dkt. 27). In addition, because irreparable harm has been established, and there is a likelihood of success with respect to the claims in this litigation, the Court grants the preliminary injunctive relief sought by Petitioners. (Dkt. 38). Respondents must comply with their internal directive concerning parole hearings—an internal directive that Respondents recently embraced before the Supreme Court, telling the Justices that it remained in full force and effect. Moreover, after six months of detention, Respondents must provide individualized bond hearings and establish by clear and convincing evidence that an asylum-seeker is a flight risk or a danger to the community to justify continued detention.

Although the grant of preliminary injunctive relief will alter the status of the parties—it means that asylum-seekers being detained in Batavia will be afforded certain procedural protections—the relief is nonetheless warranted because to act otherwise would

- 2 -

mean that these individuals would be detained without any appropriate process. Although the Court recognizes that the law in this area is evolving, and the legal landscape could change in the future, the continued detention of these asylum-seekers who have passed credible fear interviews, without being afforded minimal procedural protections, would result in extreme or very serious irreparable damage. As a result, for the reasons discussed further below, Petitioners' motion for a preliminary injunction (Dkt. 38) is granted.

## FACTUAL BACKGROUND

Petitioner Hanad Abdi ("Abdi") is a 26-year-old native of Somalia. (Dkt. 38-5 at ¶¶ 1-2). He and his family are members of a minority tribe in Somalia. (*Id.* at ¶ 5). After rival tribal members killed his father, they captured Abdi and beat him. (*Id.* at ¶¶ 7-10). Abdi managed to escape and fled his home country in June 2016. (*Id.* at ¶¶ 10, 15). After an arduous journey through more than ten countries, Abdi arrived at the southern U.S. border on October 12, 2016, seeking asylum. (*Id.* at ¶¶ 15-17). After two weeks at a detention center in Texas, he was transferred to the Buffalo Federal Detention Facility in Batavia, New York, on or about October 26, 2016. (*Id.* at ¶ 18). The officer who interviewed Abdi in connection with his request for asylum determined that "[t]here is a significant possibility that the assertions underlying the applicant's claim [for asylum] could be found credible in a . . . hearing," and asylum proceedings have been scheduled before an immigration judge. (*Id.* at ¶¶ 19-22, Ex. A & B). However, his requests for parole were repeatedly denied until August 16, 2017, when Abdi was released on parole after commencement of this litigation. (Dkt. 38-3 at ¶¶ 16-17; Dkt. 38-5 at ¶¶ 23-35). Abdi

has subsequently been informed that his parole was revoked, but he remains out of custody. (*Id*. at ¶ 17).

Johan Barrios Ramos ("Barrios Ramos") is a 40-year-old native and citizen of Cuba who was involved with political opposition and human rights work in his native country. (Dkt. 38-4 at ¶¶ 1, 2, 4). For 11 months, he was imprisoned in Cuba for his political activities. (*Id*. at ¶ 5). He fled Cuba in December 2016, and arrived in Mexico by raft. (*Id*. at ¶¶ 9, 10). He traveled to the U.S.-Mexico border, arriving on January 14, 2017, and sought asylum in the United States. (*Id*. at ¶¶ 10-11). He passed his credible fear interview (i.e., the process through which a preliminary determination is made that an asylum-seeker has a viable claim for asylum), and asylum proceedings have been scheduled. (*Id*. at ¶¶ 11, 17). However, his requests for parole were repeatedly denied with no explanation (*id*. at ¶¶ 11-15)—that is, until after commencement of this litigation, when Barrios Ramos was paroled on September 14, 2017 (Dkt. 38-3 at ¶ 18).

In addition to Abdi and Barrios Ramos, Petitioners have submitted declarations from 23 similarly situated individuals who have all sought asylum in this country, have passed their credible fear interviews, and who were detained for many months (and in some cases over a year) at the Buffalo Federal Detention Facility without parole or a bond hearing. (*See* Dkt. 38-6 (Abdirashid Musa, detained since January 2017); Dkt. 38-7 (Muktar Mohamed, detained in January 2017, but released in September 2017 (Dkt. 51-1 at 6-7)); Dkt. 38-8 (Koffi Sewoul, detained since May 2017); Dkt. 38-9 (Joseph Baptiste, detained in November 2016, but released in September 2017 (Dkt. 51-1 at 7)); Dkt. 38-10 (Dieusauveur Flezinord, detained since December 2016); Dkt. 38-11 (Saikou Touray,

detained in January 2017, but released in October 2017 (Dkt. 51-1 at 96-97)); Dkt. 38-12 (Salad Suraw Abdi, detained since January 2017); Dkt. 38-13 (Muhamed Ahmed Hirsi, detained since September 2016); Dkt. 38-14 (Ahmed Mohamed Ahmed, detained since January 2017); Dkt. 38-15 (Abdirahman Elmi Nor, detained since January 2017); Dkt. 38-16 (Dayron Hernandez Gutierrez, detained in February 2017, but released in September 2017 (Dkt. 51-1 at 6)); Dkt. 51-1 at 11 (Kazeem Akinpelu Azeez, detained since January 2017); *id.* at 19 (Mamadou Barry, detained since November 2016); *id.* at 29 (Abdimalik Mohamed, detained since December 2016); *id.* at 35 (Niang Abdou Lahad, detained since October 2016); *id.* at 46 (Mamadou Diallo, detained since January 2017); *id.* at 51 (Jacob Akwotark Baye, detained since October 2016); *id.* at 59 (Ismail Noor Mohamed, detained since September 2016); *id.* at 70 (Yacob Abraham Weldegiorgis, detained since June 2017); *id.* at 86 (Denel Thomas, detained since December 2016); *id.* at 117 (Abraham Hagos Gashne, detained since June 2017); *id.* at 124 (Abraham Zerom Weldemikael, detained since June 2017); *id.* at 131 (Bereket Araya Ghidewon, detained since October 2016)).

These asylum-seekers are detained pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii). An individual detained under § 1225(b) can be paroled "into the United States temporarily" by the Attorney General "in his discretion." 8 U.S.C. § 1182(d)(5)(A). A 2009 directive issued by Immigration and Customs Enforcement ("ICE") ("the ICE Directive" or "the Directive") sets forth certain procedures that must be utilized when evaluating parole requests. (Dkt. 38-3 at 8-17); ICE Directive No. 11002.1: *Parole of Arriving Aliens Found*

to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).[1] While the Directive makes it clear that parole determinations are inherently discretionary decisions, certain minimum procedural safeguards are required when making these discretionary determinations. For instance, the asylum-seeker must be provided written notice of the parole process in a language that he or she understands, ICE Directive No. 11002.1, ¶¶ 6.1, 8.1, and parole interviews must normally be conducted within seven days of a credible fear finding, *id.* at ¶ 8.2. Moreover, parole decisions must be uniformly documented, *id.* at ¶ 6.2, written notification of the parole decision must be provided, *id.* at ¶ 6.5, and a "brief explanation of the reasons for any decision to deny parole" must be provided, *id.* Additionally, the asylum-seeker must be advised of the right to request a redetermination of the decision "based upon changed circumstances or additional evidence." *Id.*

Earlier this year, Respondents represented to the United States Supreme Court that the ICE Directive "remains in full force and effect." *See* Supplemental Reply Brief for Petitioners, at 6 n.2, *Jennings v. Rodriguez*, No. 15-1204 (brief filed Feb. 21, 2017). Nonetheless, according to Petitioners, the ICE Directive is being consistently disregarded and ignored at the Buffalo Federal Detention Facility in Batavia. Moreover, although the Second Circuit and other courts have recognized the right to a bond hearing after detention in certain immigration contexts that last longer than six months (including in the case of

---

[1]     The text of the ICE Directive can be found in various submissions by the parties, including at Docket 38-3, pages 8-17. Throughout the remainder of this Decision, the Court will cite directly to the Directive:  ICE Directive No. 11002.1.

aliens with criminal records detained under 8 U.S.C. § 1226), in this case none of the asylum-seekers have been granted a bond hearing.

On July 28, 2017, Petitioners filed a petition for a writ of habeas corpus. (Dkt. 1). Petitioners filed an amended petition on August 21, 2017, as well as a complaint for declaratory and injunctive relief. (Dkt. 17). In the amended petition, Petitioners raise class action allegations and assert that Respondents have violated and continue to violate the statutory and constitutional rights of Petitioners and the members of the putative class. (*Id.* at 23-24). Petitioners allege that Respondents maintain a practice of denying parole to asylum-seekers detained at the Buffalo Federal Detention Facility who have passed a credible fear interview. (*Id.* at 1-2). Petitioners also allege that a subclass of similarly situated asylum-seekers have been or will be detained for more than six months without a bond hearing before an immigration judge. (*Id.* at 3).

On August 25, 2017, Petitioners moved to certify the class. (Dkt. 19). On September 12, 2017, Respondents moved to dismiss for lack of jurisdiction and failure to state a claim. (Dkt. 27). On September 25, 2017, Petitioners filed a motion for a preliminary injunction. (Dkt. 38). After briefing on the motion to dismiss (Dkt. 48; Dkt. 49), and the preliminary injunction motion (Dkt. 50; Dkt. 51), oral argument was held before the undersigned on October 27, 2017, at which time the Court reserved decision.

## DISCUSSION

Petitioners contend that the parole practices at the Buffalo Federal Detention Facility have changed significantly since President Trump came into office. Petitioners offer various statistics supporting their contentions (Dkt. 38-17), as well as testimony from

detained asylum-seekers that they have been told by immigration officials that the Trump administration has eliminated parole (*see, e.g.*, Dkt. 38-5 at ¶ 36; Dkt. 38-6 at ¶ 3; Dkt. 38-13 at ¶ 5; Dkt. 38-14 at ¶ 2). While acknowledging "changes in general enforcement objectives under the Trump Administration" (Dkt. 50-1 at ¶ 4), Respondents contest that the change in administration has caused any alteration of policy (Dkt. 50-2 at ¶ 2).

This Court cannot determine based on the written record the reasons for any alteration in the parole practices in Batavia. However, the motivations behind the failure to follow the ICE Directive at the Buffalo Federal Detention Facility or to provide bond hearings after six months of detention—while perhaps politically meaningful—are not legally significant. What is important to this Court's analysis is the fact that the Directive is being violated and that asylum-seekers are being held for longer than six months without individualized bond hearings. Respondents do not, and cannot, ultimately contend that they are adhering to the dictates of the ICE Directive or providing bond hearings after six months of detention. Instead, they take the position that the ICE Directive is not legally enforceable and that bond hearings are not required. Because the Court disagrees on both counts, the motions before the Court can be resolved on the papers. Respondent's motion to dismiss is denied, and Petitioners' preliminary injunction motion is granted.

I.    **Respondents' Motion to Dismiss**

Respondents seek dismissal under Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject matter jurisdiction to consider Petitioners' parole claims, and under Rule 12(b)(6), contending that Petitioners have failed to state a valid claim for habeas

corpus relief. In addition, Respondents contend that the release from custody of both Abdi and Barrios Ramos renders moot any claims asserted in this litigation.

Because Petitioners do not challenge the ultimate decision to deny parole, but rather challenge the procedures employed when evaluating a parole request, this Court has subject matter jurisdiction to consider the parole claims. Moreover, Petitioners have stated valid claims challenging both the failure to follow the ICE Directive in connection with parole decisions, and the failure to grant a bond hearing to those individuals detained longer than six months pursuant to *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3562 (U.S. Mar. 25, 2016) (No. 15-1205), *cross-petition for cert. denied*, 136 S. Ct. 2494 (2016). Finally, the release of Abdi and Barrios Ramos from custody does not render their claims moot because, at any time, those decisions could be reversed at Respondents' discretion.

### A.     Motion to Dismiss Pursuant to Rule 12(b)(1)

Respondents argue that this Court lacks jurisdiction to consider Petitioners' claims regarding the denial of temporary parole. (Dkt. 27-1 at 14). Federal courts are courts of limited jurisdiction and possess only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). The party asserting jurisdiction bears the burden of establishing that a court has jurisdiction over a particular claim. *Id.* When a movant challenges subject matter jurisdiction, a district court may "consider affidavits and other materials beyond the pleadings" and "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Iqbal v. Sec'y, U.S. Dep't of*

*Homeland Sec.*, 190 F. Supp. 3d 322, 326-27 (W.D.N.Y. 2016) (citations omitted). However, the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Hadees v. Johnson*, 5:15-CV-1087, 2016 WL 5349789, at * 1 (N.D.N.Y. Sept. 23, 2016) (citations omitted).

Petitioners were detained pursuant to 8 U.S.C. § 1225(b). That statute provides that if a non-citizen "who is arriving in the United States" indicates an intention to apply for asylum or expresses a fear of persecution or torture, the individual is referred for an interview to determine whether he or she has a credible fear of persecution.[2] 8 U.S.C. § 1225(b)(1)(A)(ii). If the individual is determined to have a credible fear of persecution, he "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii).

An individual detained under § 1225(b) can be paroled "into the United States temporarily" by the Attorney General "in his discretion." *Id.* § 1182(d)(5)(A). Agency regulations provide that the Secretary of Homeland Security "may invoke" the authority to parole an individual who is "neither a security risk nor a risk of absconding" and meets one or more of a series of conditions, one of which is that "continued detention is not in the public interest." 8 C.F.R. § 212.5(a), (b)(5). The ICE Directive explains how the term "public interest" is to be interpreted. *See* ICE Directive No. 11002.1. The Directive

---

[2]    A credible fear of persecution is defined under the statute as follows: "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. § 1158]." 8 U.S.C. § 1225(b)(1)(B)(v).

provides that "[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case." *Id.* at ¶ 6.2. When an arriving alien found to have a credible fear establishes to the satisfaction of ICE his or her identity and that he or she presents neither a flight risk nor a danger to the community, "[ICE] should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.*

Pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii), "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," with the exception of determinations regarding eligibility to apply for asylum under 8 U.S.C. § 1158(a). The Second Circuit has construed the phrase "this subchapter" in § 1252(a)(2)(B)(ii) to mean "subchapter II of Chapter 12 of Title 8 of the United States Code, which includes §§ 1151-1381." *Sanusi v. Gonzales*, 445 F.3d 193, 198 (2d Cir. 2006). The temporary parole sought by Petitioners is governed by § 1182(d)(5)(A), and therefore is subject to the jurisdictional restrictions of § 1252(a)(2)(B)(ii). In other words, parole decisions are at the discretion of the Attorney General and the Secretary of Homeland Security; thus, discretionary decisions regarding parole under § 1182(d)(5)(A) are not reviewable by a court, pursuant to § 1252(a)(2)(B)(ii). *See, e.g.*, *Viknesrajah v. Koson*, No. 09-CV-6442 CJS, 2011 WL 147901, at *2 (W.D.N.Y. Jan. 18, 2011).

Petitioners acknowledge that the Attorney General's discretionary decisions to deny parole are not subject to judicial review. (Dkt. 48 at 15). However, Petitioners contend

that their challenge rests on the procedures employed by Respondents in administering the parole process—not on the ultimate decision to grant or deny parole. (*Id.*). Respondents counter that Petitioners' attempt to repackage the true nature of their claims is a distinction without a difference. (Dkt. 49 at 7). Respondents contend that under *Giammarco v. Kerlikowske*, 665 F. App'x 24 (2d Cir. 2016), Petitioners' challenge is not reviewable. Respondents assert that *Giammarco* stands for the proposition that the process by which ICE reaches its decisions is itself discretionary and therefore unreviewable.

In *Giammarco*, the petitioner, who had been removed from the United States as an aggravated felon, filed a petition for a writ of habeas corpus *ad testificandum* seeking reentry to comply with a legislative subpoena. *Id.* at 25. The Second Circuit concluded that it lacked subject matter jurisdiction under § 1252(a)(2)(B)(ii) because the habeas petition was an indirect challenge to discretionary decisions by the respondents denying parole, a visa waiver, and a visitor visa. *Id.* The court explained that it lacked jurisdiction because "a decision in [the petitioner's] favor would render the prior discretionary denials invalid." *Id.* at 26.

*Giammarco* is distinguishable from the facts of this case because Petitioners are not challenging the discretionary decision itself. A decision in favor of Petitioners would not compel a particular result with respect to parole, but rather would impact only the execution of the policies and procedures surrounding the ultimate parole decision. Petitioners are not asking this Court to interfere with the ultimate decision regarding parole—that issue would plainly fall outside this Court's jurisdiction pursuant to § 1252(a)(2)(B)(ii). However, Petitioners are asking that this Court ensure that Respondents comply with certain policies

and procedures in making that parole decision—issues that are beyond the jurisdictional bar of § 1252(a)(2)(B)(ii).

Indeed, courts have held that the jurisdictional bar in § 1252(a)(2)(B)(ii) is narrow. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the habeas petitioner challenged the Attorney General's authority, under the post-removal-period statute, 8 U.S.C. § 1231(a)(6), to detain a removable alien indefinitely beyond the removal period. *Id.* at 682. The Court recognized that § 1252(a)(2)(B)(ii) bars review of discretionary decisions under the post-removal-period statute—including the decision to detain an alien ordered removed beyond the removal period—but held that the petitioners were not seeking review of the Attorney General's exercise of discretion; "rather, they challenge[d] the extent of the Attorney General's authority under the post-removal-period detention statute." *Id.* at 688. The Court concluded that "the extent of that authority is not a matter of discretion." *Id.*

The Second Circuit considered the limits of the jurisdictional bar in *Sharkey v. Quarantillo*, 541 F.3d 75 (2d Cir. 2008). In that case, the plaintiff argued that Immigration and Naturalization Service ("INS")[3] had attempted to rescind her status as a Lawful Permanent Resident ("LPR") "without following the mandatory statutory and regulatory procedures governing the rescission of" that status. *Id.* at 81. INS moved to dismiss the complaint for lack of subject matter jurisdiction, and the district court granted the motion on the basis that § 1252(a)(2)(B)(ii) precluded review. *Id.* at 82. The Second Circuit reversed, holding that this provision did not bar the plaintiff's unlawful rescission claim

---

[3]    The agency formerly called INS is no longer in existence, and some of its functions are now performed by ICE. *See Brito v. Mukasey*, 521 F.3d 160, 162 n.2 (2d Cir. 2008).

because "the alleged rescission was not performed in accordance with the mandatory rescission procedures. . . . Thus, the alleged rescission was not 'specified . . . to be in the discretion of the Attorney General.'" *Id.* at 86 (quoting *Firstland Int'l, Inc. v. INS*, 377 F.3d 127, 130-31 (2d Cir. 2004)).

Here, as in *Zadvydas* and *Sharkey*, Petitioners do not challenge the ultimate parole decision under § 1182(d)(5)(A). Rather, Petitioners allege that Respondents have violated and continue to violate the ICE Directive that they claim to be following. (Dkt. 17 at 2). Petitioners contend that the parole rate has dramatically dropped since January 2017 (*id.*); that deportation officers told them that parole was no longer available (*id.* at 15); and Petitioners received denial notices that did not comply with the ICE Directive (*id.* at 6-7, 12-15). Petitioners do not ask the Court to consider whether any decision to deny parole was improper. Instead, Petitioners seek a ruling that Respondents' failure to follow their own policy directive is unlawful. In other words, Petitioners simply seek compliance with certain minimum procedural safeguards when parole decisions are made—they do not seek to have this Court interfere with the ultimate parole decision. Section 1252(a)(2)(B)(ii) does not bar that claim.

Respondents attempt to distinguish *Zadvydas* and *Sharkey*, arguing that the challenges in those cases were grounded in the statutory framework, as opposed to an internal memo. (Dkt. 49 at 8). Petitioners challenge the failure to follow procedures that flow from an internal directive, and Respondents contend that internal directives are not binding. (Dkt. 27-1 at 16-17). According to Respondents, because the procedures that Petitioners seek to enforce are not codified in a statute or regulation, and because the

- 14 -

decision to grant or deny parole is discretionary, the procedures in the ICE Directive are also discretionary. Respondents argue that this fact divests this Court of jurisdiction because the case is brought under 28 U.S.C. § 2241, the habeas corpus statute, which limits the Court's habeas jurisdiction to reviewing for "statutory or constitutional errors." (*Id.* at 17-18); *Sol v. INS*, 274 F.3d 648, 651 (2d Cir. 2001).

Respondents are correct that courts in this Circuit have held that federal jurisdiction over § 2241 petitions does not extend to "review of factual or discretionary determinations." *Sol*, 274 F.3d at 651. However, Respondents improperly characterize Petitioners' claims. Although Petitioners have alleged facts in support of their claim that the Buffalo Federal Detention Facility is failing to abide by the ICE Directive, Petitioners ultimately contend that this failure violated their rights under 8 U.S.C. § 1182(d)(5)(A), 8 C.F.R. § 212.5, and the "*Accardi* doctrine" (as discussed below).

For the reasons explained below in the analysis of Respondents' motion to dismiss pursuant to Rule 12(b)(6), the Court concludes that Petitioners have asserted questions of law, and that Petitioners' claims therefore fall within this Court's habeas jurisdiction. Accordingly, Respondents' motion to dismiss Petitioners' parole claims under Rule 12(b)(1) is denied.

## B.    Motion to Dismiss Pursuant to Rule 12(b)(6)

### 1.    Parole Claims

In addition to their jurisdictional challenge, Respondents assert that even if Petitioners' parole claims are not precluded by § 1252(a)(2)(B)(ii), those claims are meritless. A court should consider a Rule 12(b)(6) motion to dismiss for failure to state a claim "accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citation omitted). The Court "may only consider facts stated in the complaint or documents attached to the complaint." *Spikes Bell v. Cont'l Sch. Of Beauty*, 11 F. Supp. 3d 403, 406 (W.D.N.Y. 2014). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("The plausibility standard is not akin to a probability requirement. . . . [A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." (citations, alterations, and internal quotation marks omitted)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration and

citations omitted). Thus, "at a bare minimum, the operative standard requires the 'plaintiff to provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level.'" *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (alteration and citations omitted).

Respondents argue that Petitioners fail to state a claim for relief because the ICE Directive is not binding, and any failure to follow its terms is not subject to legal challenge. (Dkt. 49 at 8-9). Respondents contend that the ICE Directive does not create any rights, privileges, or benefits enforceable against the United States. (*Id.* at 8). According to Respondents, Petitioners received the process that they are due and cannot assert otherwise on the basis of a failure to comply with the terms of an internal directive.

Petitioners respond that the "*Accardi* doctrine" dictates that Respondents are bound by the ICE Directive and the procedural steps and substantive criteria that it sets out. (Dkt. 48 at 20-21). In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), the Supreme Court held that "regulations with the force and effect of law supplement the bare bones" of federal statutes. *Id.* at 265. In that case, the Court vacated a deportation order on the ground that the procedure that preceded the order did not conform to the relevant regulations. *Id.* at 267-68; *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (striking down a Bureau of Indian Affairs determination that did not comply with procedures set forth in the agency's manual). The Second Circuit later held, in *Smith v. Resor*, 406 F.2d 141 (2d Cir. 1969), that the *Accardi* rationale applies even when a court is reviewing "the merits of decisions made within the area of discretion delegated to administrative agencies." *Id.* at 145. The court explained that courts "have insisted that where the

- 17 -

agencies have laid down their own procedures and regulations, those procedures and regulations cannot be ignored by the agencies themselves even where discretionary decisions are involved." *Id.*

In *Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir. 1991), the Second Circuit interpreted the *Accardi* doctrine in the immigration context and concluded that "[i]ts ambit is not limited to rules attaining the status of formal regulations." *Id.* at 167. The court explained that "'[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register." *Id.* (quoting *Morton*, 415 U.S. at 235).

Following *Montilla*, a district court in the Southern District of New York held that INS was required to adhere to internal directives in its Parole Project Memorandum, which listed criteria for INS district directors to apply to parole applications and established a process for evaluating detainees' claims. *Zhang v. Slattery*, 840 F. Supp. 292, 293-96 (S.D.N.Y. 1994). The court rejected the respondents' argument that the memorandum conferred no substantive rights on detainees and lacked the force of law, explaining that the important consideration was that the memorandum affected detainees' rights and was intended to benefit detainees seeking asylum. *Id.* at 294-95. The court relied on the Eleventh Circuit's decision in *Pasquini v. Morris*, 700 F.2d 658 (11th Cir. 1983), in which that court held that an INS internal operating instruction, while not providing the force and effect of substantive law, did confer "the *procedural right* to be considered for" deferred action status. *Id.* at 663 n.* (internal quotation marks omitted).

Respondents cite a number of different cases that they assert are controlling. (Dkt. 27-1 at 17). The Court disagrees and concludes that these cases are distinguishable. Respondents argue that in *Schweiker v. Hansen*, 450 U.S. 785 (1981), the Supreme Court retreated from the broadest reading of *Morton* when it held, in a per curiam opinion, that an internal manual had no legal force and did not bind the Social Security Administration. *Id.* at 789. *Schweiker* addressed the circumstances under which the federal government would be estopped from insisting upon compliance with valid regulations governing the distribution of welfare benefits, and held that a government employee's "minor breach" of a claims manual's internal guidelines did not justify invocation of the estoppel doctrine. *Id.* at 789-90; *see also Edwards v. U.S. Dep't of Agr.*, 584 F. Supp. 2d 595, 598 (W.D.N.Y. 2008) (citing *Schweiker* and holding, without further explanation, that the plaintiff could not rely on agency's internal manuals in arguing that it had failed to comply with internal rules in handling his case). Neither *Accardi* nor *Morton* are cited in the *Schweiker* decision, and the Second Circuit has continued to follow the *Accardi* doctrine after *Schweiker*. *See, e.g., Montilla*, 926 F.2d at 167 (recognizing that "the cases are not uniform in requiring that every time an agency ignores its own regulation its acts must subsequently be set aside," but holding that "[t]he doctrine has continued vitality, particularly where a petitioner's rights are 'affected'").

Respondents also rely on *Binder & Binder P.C. v. Barnhart*, 481 F.3d 141 (2d Cir. 2007), where the Second Circuit held that the Social Security Administration could not rely on its own internal document to vacate an award of attorney's fees. *Id.* at 151. However, that case was not governed by *Accardi* because the "rights of individuals" were not affected

- 19 -

by the document at issue—the agency sought to rely on the document for its own benefit. *Id.* at 786. *See also James v. U.S. Parole Comm'n*, 159 F.3d 1200 (9th Cir. 1998) (holding that the petitioner could not rely on an interpretive guideline intended to guide the Parole Commission in its calculation of release dates consistent with the Sentencing Guidelines). And in *Cruz-Miguel v. Holder*, 650 F.3d 189 (2d Cir. 2011), relied on by Respondents, the court held only that, in interpreting the phrase "paroled into the United States" in 8 U.S.C. § 1255(a)—the statute that identifies aliens who may seek "adjustment of status"—there was no statutory ambiguity. *Id.* at 200. The petitioners relied on internal agency memoranda in arguing that Congress intended the phrase "paroled into the United States" in § 1255(a) to include aliens released on "conditional parole" under § 1226(a)(2)(B). *Id.* The court concluded that the statute was unambiguous on that issue, rejecting the petitioners' attempt to rely on the internal documents to contradict the plain language of the statute. *Id.* Unlike in *Cruz-Miguel*, there is no statutory provision that unambiguously governs in this case. This is not a situation where a statute (or regulation) sets forth the procedures to be utilized in evaluating whether an asylum-seeker's "continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5); rather, the ICE Directive sets forth those procedures.

Nor do the cases that Respondents relied on most heavily at oral argument on this motion resolve the issue. Respondents argued that the court in *Thevarajah v. McElroy*, No. 01-cv-3009, 2002 WL 923914 (E.D.N.Y. Apr. 30, 2002), declined to hold that INS was bound by certain standards in a 1992 internal memorandum. *Id.* at *4-5. In reality, the court in *Thevarajah* did not decide whether the agency was bound to apply the standards

in the memorandum; instead, the court was "satisfied that [the agency] took [the standards] into appropriate consideration." *Id.* at *5. The court "reject[ed] [the] petitioner's argument that the District Director failed to apply the proper legal standard in denying . . . parole." *Id.* Similarly, in *Naul v. Gonzales*, No. 05-4627 (JAG), 2007 WL 1217987 (D.N.J. Apr. 23, 2007), another case cited by Respondents, the court found that the respondents had comported with the guidelines of an internal parole memorandum. *Id.* at *3 n.8. In that case, the petitioner argued that the internal memorandum "mandate[d] his parole," but the court concluded that it "provide[d] guidance to asylum pre-screening interviewers concerning the decision to recommend parole or not." *Id.* at *3. Thus, neither *Thevarajah* nor *Naul* holds that agencies cannot be bound by internal directives. *See also Ferreras v. Ashcroft*, 160 F. Supp. 2d 617, 624 (S.D.N.Y. 2001) (stating, without explanation, that "[w]hether the INS followed through on its directive . . . is not a constitutional matter generally, nor is it determinative of the statutory provision governing Petitioner's detention").

Respondents also argue that the ICE Directive cannot create any enforceable rights because the document itself provides that it "is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States." ICE Directive No. 11002.1, ¶ 10. Respondents cite *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006), a case that also concerned a regulation with a provision disclaiming the creation of any legally enforceable rights—in that case, Department of Justice ("DOJ") guidelines for issuing subpoenas to news media. The news media sought

to set aside the finding of civil contempt on the ground that the subpoenas did not comply with the DOJ regulations. Distinguishing *Morton*, the court explained that the regulation in that case was intended to benefit potential beneficiaries of government assistance, whereas the DOJ guidelines in *Judith Miller* provided no enforceable rights to individuals and were merely intended to guide the discretion of prosecutors. *Id.* at 1152.[4] Here, in contrast, the ICE Directive—like the procedure at issue in *Morton*—affects the rights of individuals. The ICE Directive does not simply guide the discretion of immigration officials in making parole determinations. Rather, it sets forth specific procedural rights for asylum-seekers in connection with the parole process, such as being informed in writing as to the reason parole was denied.

In short, Respondents cite no case law that would compel the conclusion that agencies can avoid application of *Accardi* by simply disclaiming any binding effect in the directive itself. To find otherwise would render the teachings of *Accardi* and its progeny meaningless. It is not the internal policy itself that creates (or eliminates) the rights of enforcement. Rather, the relevancy of the internal policy is to ascertain whether it pertains to individual rights. If so, under binding Supreme Court and Second Circuit precedent, that internal policy must be followed. In the words of the Supreme Court, "[w]here the

---

[4]   Respondents' citation to *United States v. Loften*, 518 F. Supp. 839 (S.D.N.Y. 1981), is also not persuasive. There, the court briefly addressed the defendant's claim that the government had not complied with the U.S. Attorney's Manual in initiating the prosecution, and the court not only determined that the prosecution was properly authorized, but also concluded that internal government policies could not thwart a criminal prosecution. *Id.* at 857.

rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required. . . ." *Morton*, 415 U.S. at 235.[5]

Here, Respondents represented to the Supreme Court in February 2017 that the ICE Directive "remains in full force and effect." Supplemental Reply Brief for Petitioners, at 6 n.2, *Jennings v. Rodriguez*, No. 15-1204 (brief filed Feb. 21, 2017). In their briefing submitted in *Jennings*, Respondents touted the ICE Directive as a reason for their position that bond hearings are not required for asylum-seekers detained under 8 U.S.C. § 1225(b). *Id.* at 5-6. Respondents told the Supreme Court that "the existing framework provides more than sufficient process" and stated that the ICE Directive "provides for notice to the alien, an interview, the opportunity to respond and present evidence, a custody determination . . . supervisory review, and further parole consideration based upon changed circumstances or new evidence." *Id.* at 6-7. Respondents cannot now contend in this Court that the ICE Directive does not affect the rights of individuals. Plainly, the ICE Directive affects the rights of individuals. As a result, Petitioners' contention that Respondents have

---

[5] Petitioners also rely on *Bertrand v. Strava*, 684 F.2d 204 (2d Cir. 1982), to support their argument that Respondents' parole determinations may be challenged for failing to comply with the ICE Directive because non-compliance indicates that the parole determination is not facially legitimate and bona fide. (Dkt. 38-1 at 22). Respondents contend that the "facially legitimate and bona fide" standard no longer applies, in light of the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(B)(ii). (Dkt. 50 at 11-12). *See Viknesrajah v. Koson,* No. 09-CV-6442 CJS, 2011 WL 147901, at *2 (W.D.N.Y. Jan. 18, 2011) (enactment of § 1252(a)(2)(B)(ii) limited the applicability of *Bertrand* by barring review of "discretionary decisions concerning parole"). The Court need not resolve *Bertrand*'s continued applicability at this stage of the litigation, since it has determined that Petitioners may challenge the failure to comply with the procedures set forth in the ICE Directive under the *Accardi* doctrine.

failed to comply with the procedures set forth in the ICE Directive when making discretionary decisions concerning parole states a valid claim for habeas corpus relief.

### 2.    Bond Hearing Claims

Respondents also seek dismissal of Petitioners' claims that their detention without a bond hearing violates 8 U.S.C. § 1225(b) and the Due Process Clause. (Dkt. 27-1 at 21). According to Respondents, Petitioners are arriving aliens and are treated, for constitutional purposes, as if stopped at the border. (*Id.*); *see, e.g.*, *Correa v. Thornburgh*, 901 F.2d 1166, 1171 n.5 (2d Cir. 1990) ("Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection."). Therefore, Respondents contend, Petitioners are ineligible for the constitutional protections guaranteed to persons inside the United States. (Dkt. 27-1 at 21).

Petitioners are detained pursuant to § 1225(b). Nothing in that statute or the associated regulations limits the length of detention. *See Saleem v. Shananhan*, No. 16-CV-808 (RA), 2016 WL 4435246, at * 2 (S.D.N.Y. Aug. 22, 2016), *appeal filed*, No. 16-3587 (2d Cir. Oct. 21, 2016). Furthermore, neither the Supreme Court nor the Second Circuit has addressed whether indefinite detention under § 1225(b) violates the Due Process Clause, but the issue is currently pending before both courts.[6]

In *Lora*, the Second Circuit considered the question of indefinite detention in the context of § 1226(c), which mandates detention during the pendency of removal

---

[6]    The issue is before the Supreme Court in *Jennings v. Rodriguez*, No. 15-1204 (U.S. argued Nov. 30, 2016), and before the Second Circuit in *Arias v. Aviles*, No. 16-3186 (2d Cir. filed Sept. 12, 2016) (proceedings stayed pending the outcome of *Jennings*).

proceedings of non-citizens who have committed certain criminal offenses. 804 F.3d at 613-16. The Second Circuit joined the Third, Sixth, and Ninth Circuits in concluding that, to avoid "serious constitutional concerns," § 1226(c) must be read to include a temporal limitation on detention. *Id.* at 613. The Second Circuit, following the reasoning of the Ninth Circuit in *Rodriguez v. Robbins*, 715 F.3d 1127, 1131 (9th Cir. 2013) ("*Rodriguez II*"), held that "an immigrant detained pursuant to section 1226(c) must be afforded a bail hearing before an immigration judge within six months of his or her detention." *Lora*, 804 F.3d at 616. The Court held that the detainee "must be admitted to bail unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community." *Id.* at 616 (quoting *Rodriguez II*, 715 F.3d at 1131).

A number of courts in the Southern District of New York have considered cases involving detention pursuant to § 1225(b), the statute under which Petitioners in this case are detained. Those courts are split on whether *Lora* extends to § 1225(b). In *Cardona v. Nalls-Castillo*, 177 F. Supp. 3d 815 (S.D.N.Y. 2016), the court held that an LPR detained under § 1225(b) was not entitled to a bond hearing, regardless of the length of detention. *Id.* at 816. By way of analysis, the court stated only that *Lora* had addressed the issue in the context of § 1226(c) and was therefore inapplicable to an individual detained under § 1225(b), and that § 1225(b) and accompanying regulations do not provide for an individualized bond hearing. *Id.* The court reached the same conclusion in *Perez v. Aviles*, 188 F. Supp. 3d 328 (S.D.N.Y. 2016). There, the court explained that there had been no

- 25 -

"unreasonable delay" in pursuing or completing the petitioner's removal, and, thus, no violation of the petitioner's due process rights. *Id.* at 332.[7]

By contrast, in *Arias v. Aviles*, No. 15-CV-9249 (RA), 2016 WL 3906738 (S.D.N.Y. July 14, 2016), *appeal filed*, No. 16-3186 (2d Cir. Sept. 12, 2016), the district court extended the reasoning in *Lora* to an LPR detained under § 1225(b). *Id.* at *10. The court explained that because the petitioner in that case was an LPR who had traveled abroad only briefly, he possessed "a right to due process just as would a continuously present alien." *Id.* at *8 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). Therefore, the court concluded that the petitioner was entitled to the same rights afforded the petitioner in *Lora*. *Id.*; *Galo-Espinal v. Decker*, No. 17 Civ. 3492, slip op at 4-5 (S.D.N.Y. June 30, 2017) (same, noting the "emerging consensus among courts in this district that due process requires that individuals detained pursuant to Section 1225(b) be provided an individualized bond hearing within six months of detention"); *Morris v. Decker*, 17-CV-02224 (VEC), 2017 WL 1968314, at * 3 (S.D.N.Y. May 11, 2017) (holding that "section 1225(b) must be read to include a six-month limitation on the length of detention of an LPR without an individualized bond hearing"), *appeal filed*, No. 17-2121 (2d Cir. July 7, 2017); *Heredia v. Shanahan*, 245 F. Supp. 3d 521, 526 (S.D.N.Y. 2017) (holding LPR

---

[7]     Respondents also cite *Manu v. Shanahan*, 1:16-cv-7581, 2016 WL 5794000 (S.D.N.Y. Sept. 30, 2016), and *Gomez v. Decker*, 1:17-cv-1726, 2017 WL 1423959 (S.D.N.Y. Mar. 10, 2017), in support of their argument that individuals detained under § 1225(b) are not entitled to bond hearings. Those cases are not on point. United States District Judge Woods decided both cases and held, identically, that, assuming *Lora* applies to detentions under § 1225(b), the petitioners failed to demonstrate that they were entitled to relief because their detentions had not exceeded six months. *Gomez*, 2017 WL 1423959 at *2; *Manu*, 2016 WL 5794000 at *1.

detained under § 1225(b) was entitled to a bond hearing after six months of detention), *appeal filed sub nom. Heredia v. Decker*, No. 17-1720 (2d Cir. May 26, 2017); *Ricketts v. Simonse*, No. 15 Civ. 6662, 2016 WL 7335675, at *4 (S.D.N.Y. Dec. 16, 2016) (same).

Later, in *Saleem*, the same judge who decided *Arias* concluded that, for the reasons articulated by the Ninth Circuit in *Rodriguez II*, the reasoning in *Arias* applied to a non-resident arriving alien detained under § 1225(b). *Saleem*, 2016 WL 4435246 at * 4; *see also Rodriguez v. Robbins*, 804 F.3d 1060, 1070 (9th Cir. 2015) ("*Rodriguez III*") (rearticulating holding in *Rodriguez II*), *cert. granted sub nom. Jennings v. Rodriguez*, 136 S. Ct. 2489 (2016). In *Rodriguez II*, the Ninth Circuit cited to the Supreme Court's decision in *Clark v. Martinez*, 543 U.S. 371, 381 (2005), and applied the canon of constitutional avoidance to hold that individuals detained under § 1225(b) are entitled to a bond hearing after six months of detention. 715 F.3d at 1141-42; *see also Rodriguez III*, 804 F.3d at 1082. The court explained that "where one possible application of a statute raises constitutional concerns, the statute as a whole should be construed through the prism of constitutional avoidance." *Rodriguez II*, 715 F.3d at 1141; *see also Rodriguez III*, 804 F.3d at 1082. Because § 1225(b) applies to several categories of LPRs who are entitled to due process protections, the court explained, prolonged detentions under that statute would raise constitutional concerns. *Rodriguez II*, 715 F.3d at 1141. Consequently, the court construed the statutory scheme to require a bond hearing after six months for all individuals detained under § 1225(b). *Id.* at 1144. The *Saleem* court reached the same conclusion, stating that "[n]ow that this Court has construed § 1225(b) to avoid constitutional concerns for certain LPRs . . . it must apply that construction consistently to [the petitioner]

irrespective of 'whether or not those constitutional problems pertain to the particular litigant before the Court.'" 2016 WL 4435246, at * 4 (quoting *Clark*, 543 U.S. at 381 (2005)); *see Osias v. Decker*, 17-CV-02786 (VEC), 2017 WL 3242332, at \*5 (S.D.N.Y July 28, 2017), *vacated by Osias v. Decker*, 2017 WL 3432685 (S.D.N.Y. Aug. 9, 2017)[8] (holding "detention of an asylum seeker . . . pursuant to Section 1225(b)(1)(B)(ii) for longer than six months without an individualized bond hearing violates due process"); *see also* Transcript of Oral Argument at 70-72, *Jacques v. Decker*, 17 Civ. 2040 (S.D.N.Y. Aug. 24, 2017) (same), *appeal filed*, No. 17-3409 (2d Cir. Oct. 23, 2017); *Nord v. Decker*, 17 Civ. 3679, slip op. at 7-8 (S.D.N.Y. Aug. 23, 2017) (same), *appeal filed*, No. 17-3412 (2d Cir. Oct. 23, 2017); *Francois v. Decker*, 17 Civ. 5809, slip op. at 2 (S.D.N.Y. Aug. 16, 2017) (same), *appeal filed*, No. 17-3316 (2d Cir. Oct. 16, 2017); *Clerjuste v. Decker*, 17 Civ. 4252, slip op. at 7-8 (S.D.N.Y. Aug. 12, 2017) (same), *appeal filed*, No. 17-3273 (2d Cir. Oct. 13, 2017); Transcript of Oral Argument at 49-51, *Sammy v. Decker*, 17 Civ. 2615 (S.D.N.Y. May 25, 2017) (same), *appeal filed*, No. 17-2260 (2d Cir. July 21, 2017); *Celestin v. Decker*, 17 Civ. 2419, slip op. at 2 (S.D.N.Y. Apr. 17, 2017) (same), *appeal filed*, No. 17-1895 (2d Cir. June 15, 2017).

Respondents argue that this court should not follow the lead of the overwhelming majority of courts in this Circuit because those decisions were based on *Rodriguez II* and *III*, which, Respondents contend, hinged on facts not relevant to this case. (Dkt. 49 at 14).

---

[8] The decision in *Osias* was vacated on the grounds that the case was mooted by the petitioner's release on parole conditioned on payment of a bond. 2017 WL 3432685 at \*1.

In *Rodriguez II* and *III*, the petitioners alleged that some members of the class were LPRs, not arriving aliens. 715 F.3d at 1142; 804 F.3d at 1083. According to Respondents, because this case involves an entire proposed subclass of non-LPRs and only consists of arriving aliens, *Rodriguez II* and *III* are inapplicable. (Dkt. 49 at 15).[9]

Respondents misinterpret *Rodriguez II* and *III* as well as *Clark*, the case on which the Ninth Circuit relied. The Ninth Circuit noted that the class included LPRs but ultimately held that the constitutional avoidance doctrine applies "where *one possible application* of a statute raises constitutional concerns." *Rodriguez III*, 804 F.3d at 1082

---

[9]     Respondents also cite 8 C.F.R. § 1003.19(h)(2)(i)(B) in support of their argument that bond hearings should not be applied in this context. (Dkt. 27-1 at 24; Dkt. 50 at 29). Although they do not elaborate on the argument in their motion to dismiss or opposition to the preliminary injunction motion, in opposition to the class certification motion Respondents specifically contend that this regulation prohibits an immigration judge from releasing an arriving alien detained under § 1225(b) on bond. (Dkt. 55 at 14). The regulation provides that "an immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act." 8 C.F.R. § 1003.19(h)(2)(i)(B). It is unclear whether the text of that regulation means, as Respondents argue, that an immigration judge cannot provide a bond hearing for a § 1225(b) detainee who has been detained for more than six months. As is the case here, individuals subject to prolonged detention are unlikely to have been "paroled after arrival." Furthermore, Respondents cite no case law to support their argument, and none of the many courts in this Circuit that have required bond hearings under these circumstances have addressed that regulation.

Additionally, none of the courts outside this Circuit that have cited § 1003.19(h)(2)(i)(B) for the proposition for which Respondents cite the regulation have engaged in a textual analysis of its meaning. Moreover, those courts have concluded that due process requires a bond hearing once detention becomes "prolonged." *See, e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1143-44 (9th Cir. 2013); *Salazar v. Rodriguez*, 2017 WL 3718380 (D.N.J. Aug. 29, 2017) (holding that, despite the statutory limitation on bond hearings, an alien detained under § 1225(b) is constitutionally entitled to a bond hearing once the length of detention becomes "unreasonable").

Accordingly, § 1003.19(h)(2)(i)(B) does not change the Court's analysis about Petitioners' right to a bond hearing once detained for six months.

(emphasis added). Thus, for the constitutional avoidance doctrine to apply, this Court need not find that this particular class includes LPRs, but only that the statute applies to LPRs.

The majority of the courts in this Circuit that have considered the issue agree, and this Court finds their reasoning, and the reasoning articulated in *Rodriguez II* and *III*, persuasive. Section 1225(b) does not permit the indefinite detention of individuals detained under that statute. The courts in this Circuit that have reached the same conclusion have required a bond hearing within six months, and the Court agrees that this is an appropriate length of time. *See, e.g., Saleem*, 2016 WL 4435246, at * 5 (interpreting § 1225(b) to include a reasonable temporal limitation of six months).

The Court acknowledges that the issue is presently before the United States Supreme Court, and a ruling in *Jennings v. Rodriguez*, No. 15-1204 (U.S. argued Nov. 30, 2016), could impact the appropriateness of this Court's ruling in this case. However, the Court cannot base its decision on predicting future rulings from higher courts; rather, it must decide this case based on the current state of the law. The Court concludes that, in the Second Circuit, an individual detained pursuant to § 1225(b) is entitled to a *Lora* bond hearing once detained for more than six months. Accordingly, Petitioners have stated a valid habeas corpus claim.

### B.    Justiciability Issues: Mootness

Respondents argue that Petitioners' individual and class claims have been rendered moot by the release of Abdi and Barrios Ramos to parole supervision (on August 16, 2017, and September 7, 2017, respectively), because that was the only relief sought by Petitioners in their habeas petition. (Dkt. 27-1 at 27-29; Dkt. 49 at 16). Petitioners respond that

various exceptions to the mootness doctrine apply, and neither their individual nor their class claims are moot. (Dkt. 48 at 12-15). The Court concludes that the "voluntary cessation" exception to the mootness doctrine applies to Petitioners' individual claims, and as such, the putative class claims remain live controversies as well. Moreover, even if the individual claims were mooted, the putative class claims would survive under the inherently transitory exception to the mootness doctrine.

"The mootness doctrine is rooted in the 'case or controversy' requirement of Article III of the Constitution, which describes 'the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural.'" *Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist.*, 583 F. Supp. 2d 422, 428 (W.D.N.Y. 2008) (quoting *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001)). "A case is moot, and accordingly the federal courts have no jurisdiction over the litigation, when 'the parties lack a legally cognizable interest in the outcome.'" *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "When a habeas petitioner has been released from custody after filing a petition, the petition may be moot, and the relevant inquiry becomes whether the case still presents a case or controversy under Article III, § 2 of the U.S. Constitution." *Denis v. DHS/ICE of Buffalo*, 634 F. Supp. 2d 338, 340 (W.D.N.Y. 2009); *see Johnson v. Reno*, 143 F. Supp. 2d 389, 391 (S.D.N.Y. 2001) ("A habeas corpus petition seeking release from (INS) custody is moot when the petitioner is no longer in (INS) custody."). "Thus, 'under the mootness doctrine, if an event occurs . . . that makes it impossible for the court to grant any effectual relief whatever to a

prevailing party,' [the court] must dismiss the case, rather than issue an advisory opinion." *Farez-Espinoza v. Napolitano*, No. 08-CV-11060(HB), 2009 WL 1118098, at *4 (S.D.N.Y. Apr. 27, 2009) (quoting *ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir. 2004)).

"The Supreme Court has 'recognized an exception to the general rule [regarding mootness dismissals] in cases that are capable of repetition, yet evading review.'" *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 84-85 (2d Cir. 2005) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

> The capable-of-repetition principle applies only "where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."

*Russman*, 260 F.3d at 119 (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). "A recurrent dispute will 'evade review' if it could not be entirely litigated before again becoming moot, including prosecution of appeals as far as the Supreme Court." *Id.*

### 1. Voluntary Cessation Exception to Mootness Doctrine

"The voluntary cessation . . . exception[] can be thought of as [a] subset[] of a broader exception to mootness for cases that are capable of repetition, yet evading review." *Jobie O. v. Spitzer*, No. 03 CIV. 8331(CM), 2007 WL 4302921, at *6 (S.D.N.Y. Dec. 5, 2007) (quotation marks and citation omitted). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "Were it otherwise, 'courts would be compelled to leave

the defendant free to return to his old ways.'" *Farez-Espinoza*, 2009 WL 1118098, at *4 (quoting *Laidlaw*, 528 U.S. at 189).

"The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002) (internal quotation marks and citation omitted). "[A] party 'claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Seidemann v. Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (quoting *N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 327 (2d Cir. 2003)). "At bottom, the 'rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Mhany Mgmt., Inc. v. Count of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)).

Here, Respondents argue that Petitioners' individual claims have been mooted because both Abdi and Barrios Ramos have been released from detention, which was the sole remedy requested by Petitioners' habeas petition. (Dkt. 27-1 at 27-29). In response, Petitioners contend that the "voluntary cessation" exception to the mootness doctrine applies to this action because Respondents could revoke Abdi's and Barrios Ramos' parole and indefinitely detain Petitioners once again. (*See* Dkt. 48 at 13). Petitioners cite to the following regulation:

> [U]pon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole.

8 C.F.R. § 212.5(e)(2)(i); *see* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, . . . and when the purposes of such parole shall, *in the opinion* of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled. . . ." (emphasis added)). Courts have interpreted the language set forth in this regulatory framework as providing the Attorney General with significant discretion to revoke parole. *See, e.g., Samirah v. O'Connell*, 335 F.3d 545, 548 (7th Cir. 2003); *Centeno-Ortiz v. Culley*, No. 11-CV-1970-IEG POR, 2012 WL 170123, at *3-4 (S.D. Cal. Jan. 19, 2012); *Sillah v. Davis*, 252 F. Supp. 2d 589, 597 (W.D. Tenn. 2003).

Here, Petitioners were paroled after they filed this action. Respondents have since revoked Abdi's parole, but no explanation for this revocation appears in the record and he remains out of custody. Indeed, the declaration of Thomas Brophy, Acting Director of the ICE Buffalo Field Office, does not elaborate upon the circumstances underlying the revocation. (Dkt. 27-2 at ¶ 2 ("[Abdi's] parole was revoked by the St. Paul, MN ERO Field Office on August 23, 2017. ICE, at this time, has no intention of taking Abdi back into custody.")).

Respondents state that they do not intend to re-detain Abdi "at this time." (*Id.*). Notably, the "voluntary cessation" exception will not apply if Respondents can demonstrate that "subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (emphasis added); *see Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991) (finding the doctrine of voluntary cessation to be inapplicable where "the government filed a declaration of the director of the Los Angeles District Office of the INS who reiterated under oath" that the petitioner "will be paroled for another year" absent the occurrence of certain circumstances outside the government's control); *Farez-Espinoza*, 2009 WL 1118098, at *4 ("[D]efendants have been found to satisfy their burden by, for example, submitting a sworn affidavit disavowing any intent to ever repeat the challenged conduct."). Although Acting Director Brophy's declaration avers that Respondents do not intend to re-detain Abdi "at this time" (Dkt. 27-2 at ¶ 2), this language leaves open the possibility that Respondents could, on a whim, change course and decide to re-detain Abdi. Thus, the submitted declaration fails to carry Respondents' heavy burden of demonstrating that the challenged conduct will not reoccur. *See Farez-Espinoza*, 2009 WL 1118098, at *4 ("A general disclaimer of intent to revive the allegedly unlawful conduct is insufficient in itself to overcome the defendant's heavy burden."); *see also Mhany Mgmt., Inc.*, 819 F.3d at 604 ("We are unpersuaded that the County has committed to this course *permanently*." (emphasis added)); *Centeno-Ortiz*, 2012 WL 170123, at *4-5 (distinguishing *Pircin-Peron* because the government declaration reserved the ability to re-detain the petitioner at its discretion).

Moreover, Petitioners correctly assert that Respondents have substantial discretion to revoke their parole. At oral argument, counsel for Respondents confirmed that Respondents believe they can re-detain Abdi or Barrios Ramos at a moment's notice for essentially any reason. In *Farez-Espinoza*, the Southern District of New York concluded that the voluntary cessation exception applied to the petitioner's habeas petition because "under the Government's view, it has full statutory authority to revoke the bond and re-detain her." 2009 WL 1118098, at *7. Indeed, "the Government maintained that it was 'unquestionably permitted to detain [Farez-Espinoza] in any instance.'" *Id.*; *see Rodriguez v. Hayes ("Rodriguez I")*, 591 F.3d 1105, 1117-18 (9th Cir. 2010) (applying the voluntary cessation doctrine in holding that the petitioner's release to parole did not moot his habeas petition).

Therefore, because Respondents assume the position that they may revoke Petitioners' parole at any time, for any reason—as Petitioners suggest happened to Abdi— Petitioners' individual claims must receive the benefit of the "voluntary cessation" doctrine because the re-detention of Petitioners falls within Respondents' broad discretionary control. *See Centeno-Ortiz*, 2012 WL 170123, at *4-5; *Farez-Espinoza*, 2009 WL 1118098 at *7; *cf. Picrin-Peron*, 930 F.2d at 776. A contrary holding would permit Respondents to "return to [their] old ways" by subjecting Petitioners to a second round of prolonged detention. *Laidlaw*, 528 U.S. at 189.

## 2. Inherently Transitory Exception to the Mootness Doctrine

Here, because Petitioners' individual claims are *not* moot, Petitioners need not rely on the inherently transitory doctrine to save the viability of the putative class claims.

Nonetheless, for purposes of completeness and because it is relevant to the Court's consideration of the preliminary injunction on a class-wide basis, the Court addresses the applicability of this doctrine and finds that, in the alternative, the claims are not moot under the inherently transitory doctrine.

The "inherently transitory" exception to the mootness doctrine applies to class actions where it is uncertain whether the court will be able to timely rule upon the certification of the class "before the proposed representative's individual interest expires." *Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir. 1994) (quotation marks and citation omitted); *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 513 (S.D.N.Y. 2015) (same). Thus, where the named class representative no longer can maintain a personal interest in the litigation, the inherently transitory doctrine may still save the class action.

The Supreme Court has long recognized a "narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975). This type of claim has been described as "inherently transitory." *See County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) ("We recognized in *Gerstein* that '[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980))).

It is well-established that "[a] prisoner's length of stay at a particular prison or within a prison system is 'inherently transitory and cannot be determined from the outset.'" *Clarkson*, 783 F. Supp. at 799 (quoting *Jane B. v. N.Y.C. Dep't of Soc. Servs.*, 117 F.R.D.

64, 68 (S.D.N.Y. 1987)). Claims arising out of pretrial detentions, or detentions for "sentences of one year or less" are also "inherently transitory," *Butler v. Suffolk County*, 289 F.R.D. 80, 91 (E.D.N.Y. 2013); *see Gerstein*, 420 U.S. at 111 n.11, as are claims asserted by persons waiting on federal housing lists, some for years at a time, *Comer*, 37 F.3d at 799.

While the temporal nature of a claim may suggest whether it is "inherently transitory" or not, the application of this exception is by no means restricted to "time-limited" assertions. *Marisol A. v. Giuliani*, No. 95-CV-10533 (RJW), 1998 WL 265123, at *6 (S.D.N.Y. May 22, 1998). In fact, the Second Circuit, in applying the exception to "housing discrimination suits," has stated that such actions "are acutely susceptible to mootness *because of the fluid composition* of the public housing population." *Comer*, 37 F.3d at 797 (emphasis added); *see Marisol A.*, 1998 WL 265123, at *6 (finding that "the population of New York City's child welfare system is equally fluid, . . . [as c]hildren enter and leave the system all the time"); *see also Zurak v. Regan*, 550 F.2d 86, 92 (2d Cir. 1977) (applying the exception to "inmates serving definite sentences of more than 90 days at Rikers Island . . . who are or will become eligible for conditional release . . . [b]ecause of the relatively short periods of incarceration involved and the possibility of conditional release"). Several out-of-circuit district courts have also held that claims arising out of immigration detentions are "inherently transitory." *See, e.g., Rivera v. Holder*, 307 F.R.D. 539, 548 (W.D. Wash. 2015); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 183 (D.D.C. 2015); *Lyon v. U.S. Immigration & Customs Enf't*, 300 F.R.D. 628, 639 (N.D. Cal. 2014),

*modified*, 308 F.R.D. 203 (N.D. Cal. 2015); *Moreno v. Napolitano*, No. 11-CV-5452, 2012 WL 5995820, at *7 (N.D. Ill. Nov. 30, 2012).

The principles underlying these cases carry equal force in the instant matter. The provisions of 8 U.S.C. § 1225 mandate the detention of an arriving alien who successfully demonstrates a credible fear of persecution in his or her homeland. *See id.* § 1225(b)(1)(B)(ii). "The mandatory nature of this detention is tempered by statute as a matter of executive grace through the Attorney General's wholly discretionary parole authority under 8 U.S.C. § 1182(d)(5)(A) to release an alien temporarily on parole. . . ." *Ahad v. Lowe*, 235 F. Supp. 3d 676, 686 (M.D. Pa. 2017). As such, the duration of the putative class members' detention is not clear from the outset, and there is a strong possibility that they could be released prior to class certification. *See Gerstein*, 420 U.S. at 111 n.11 ("The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance. . . ."); *Zurak*, 550 F.2d at 92 (noting the "possibility of conditional release" in applying the inherently transitory claims exception); *Lyon*, 300 F.R.D. at 639 ("As in *Gerstein*, the length of detention cannot be ascertained at the outset and may be ended before class certification by various circumstances."); *see also Olson v. Brown*, 594 F.3d 577, 583 (7th Cir. 2010) (applying the exception where "[t]he duration of [the plaintiff's] claim was at the discretion of the Indiana Department of Correction" since "[a]n individual incarcerated in a county jail may be released for a number of reasons that he cannot anticipate"); *Moreno*, 2012 WL 5995820, at *7 ("[T]he duration of the I–247 detainers could not be determined at the outset; they were subject to the discretion of ICE officials and beyond [the p]laintiffs' control. . . . [The p]laintiffs have

no way of knowing what course an ICE investigation might take or when ICE might lift the detainers against them, if at all.").

Furthermore, despite months of detention and several form denials of Petitioners' parole requests, upon the filing of this action, Respondents swiftly requested additional information from Petitioners and granted parole to Abdi and Barrios Ramos. (*See* Dkt. 17 at 6-8, 12-15; Dkt. 27-1 at 27-28). Respondents' actions "illustrate the inherently transitory nature of [Petitioners'] claims." *Moreno*, 2012 WL 5995820, at *7 n.4; *see White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977) ("Refusing to [apply the exception] would mean that the [Social Security Administration] could avoid judicial scrutiny of its procedures by the simple expedient of granting hearings to plaintiffs who seek, but have not yet obtained, class certification. We do not suggest that this occurred here, but we must take notice of the 'reality' of that possibility in the future."); *see also Goetz v. Crosson*, 728 F. Supp. 995, 1004 (S.D.N.Y. 1990) ("[T]he possibility that the defendants could intentionally moot the named plaintiffs' claims sufficiently justifies class certification.").

In addition, as members of the putative class are released to parole, more asylum-seekers will undoubtedly arrive at the Buffalo Federal Detention Facility and successfully demonstrate the existence of a credible fear of persecution. Indeed, the monthly fluctuations in detainee population and the influx of new asylum-seekers provides good reason for the Court to "safely assume" that the composition of the putative class and subclass will remain fluid. (*See* Dkt. 19-3 at 2, 8; Dkt. 19-5); *see, e.g., Gerstein*, 420 U.S. at 111 n.11; *Comer*, 37 F.3d at 797.

As a result, even if the individual claims were moot (which, as noted above, they are not under the voluntary cessation doctrine), Petitioners' putative class action claims would continue to present a justiciable controversy pursuant to the inherently transitory doctrine.

## II.     Petitioners' Motion for a Preliminary Injunction

Petitioners seek a preliminary injunction ordering Respondents "to adjudicate or, where appropriate, readjudicate parole applications for all putative class members in conformance with their legal obligations, including by adhering to all the requirements of the ICE Directive." (Dkt. 38 at 1). Additionally, Petitioners seek preliminary injunctive relief requiring all "putative class members at Batavia who have been detained for six months or more" to be provided individualized bond hearings at which "immigration judges shall order release on bond unless 'the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community.'" (*Id.* (citing *Lora*, 804 F.3d at 616)).

In order to obtain a preliminary injunction, the moving party must establish the following: (1) a likelihood of irreparable harm absent preliminary relief; (2) a likelihood of success on the merits; (3) the balance of equities tipping in favor of the moving party; and (4) the public interest is served by an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the moving party is unable to demonstrate a likelihood of success on the merits, a court may still issue a preliminary injunction if the moving party demonstrates "'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party

requesting the preliminary relief.'" *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

"Normally, the purpose of a preliminary injunction is to maintain the status quo ante pending a full hearing on the merits. Occasionally, however, the grant of injunctive relief will change the positions of the parties as it existed prior to the grant." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (internal citations omitted), *overruled on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). "A higher standard applies . . . if the requested injunction is 'mandatory,' altering rather than maintaining the status quo, or if the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if defendant prevails at a trial on the merits." *People for Ethical Treatment of Animals v. Giuliani*, 105 F. Supp. 2d 294, 303 (S.D.N.Y. 2000), *adopted*, No. 00 CIV. 3972 (VM), 2000 WL 1639423 (S.D.N.Y. Oct. 31, 2000*)*, *aff'd*, 18 F. App'x 35 (2d Cir. 2001). The Second Circuit has "held that a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (internal quotation marks and citation omitted).

Here, Petitioners have satisfied the standard for preliminary injunctive relief on behalf of themselves and the putative class members. Petitioners have plainly established on behalf of themselves and the putative class irreparable harm absent preliminary injunctive relief, and they have also established a likelihood of success on the merits.

Although the grant of preliminary injunctive relief will alter the status of the parties in that Petitioners will be afforded certain procedural protections that they are not otherwise receiving, the relief is nonetheless warranted because, to act otherwise would mean that these individuals would be detained without any appropriate process, resulting in extreme or very serious irreparable damage. As a result, for the reasons discussed further below, Petitioners' motion for a preliminary injunction (Dkt. 38) is granted.

## A. Granting Relief to Putative Class Prior to Class Certification

A threshold issue that the Court must address is whether it is appropriate to grant preliminary injunctive relief to the putative class members prior to class certification. On August 25, 2017, before applying for a preliminary injunction, Petitioners moved to certify the class, seeking certification of the following class and subclass:

> *Class*: All arriving asylum-seekers who have passed a credible fear interview and who are or will be detained at the Buffalo Federal Detention Facility and who have not been granted parole.

> *Subclass*: All arriving asylum-seekers who are detained at the Buffalo Federal Detention Facility, have passed a credible fear interview, and have been or will be detained for more than six months without a bond hearing before an immigration judge.

(Dkt. 19 at 1). The Court issued a briefing schedule concerning the class certification motion (Dkt. 20), but instead of filing responding papers by the deadline set by the Court, Respondents filed a motion to stay the class certification motion pending resolution of Respondents' subsequently-filed motion to dismiss (Dkt. 33). The Court issued a briefing schedule concerning the motion to stay, and held the schedule for briefing on the class certification motion in abeyance until further order of the Court. (Dkt. 35). In response,

Petitioners opposed the motion to stay, but alternatively did not oppose a stay to the extent that the Court did not consider it necessary to wait for class certification before entering class-wide relief. (Dkt. 42). Petitioners argued that the absence of a final ruling on the class certification motion would not preclude class-wide relief at the preliminary injunction stage. (*Id.* at 3-4). After the oral argument on October 27, 2017, this Court issued a Text Order denying the motion to stay the class certification motion and setting a briefing schedule for the class certification motion. (Dkt. 52). As of the writing of this Decision and Order, Respondents have submitted their papers in opposition to the class certification motion (Dkt. 55), but the motion has not been decided.

Under appropriate circumstances, a court may grant preliminary injunctive relief in favor of putative class members before class certification, and correspondingly, assess the harm to putative class members when considering the preliminary injunction motion. *See Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (issuing preliminary injunctive relief before class certification without any prior finding of liability); *Strouchler v. Shah*, 891 F. Supp. 2d 504, 518-19 (S.D.N.Y. 2012) (finding that class certification was likely and considering facts relating to putative class members when adjudicating preliminary injunction motion); *Dodge v. County of Orange*, 209 F.R.D. 65, 77 (S.D.N.Y. 2002) (granting proposed class preliminary injunctive relief before certifying the class); William B. Rubenstein, *Newberg on Class Actions* § 4:30 (5th ed. 2017) ("[A] court may issue a preliminary injunction in class suits prior to a ruling on the merits.").

In *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004), the Second Circuit affirmed the district court's grant of preliminary injunctive relief in favor

of the putative class, which the district court granted in reliance on affidavits from unnamed

plaintiffs. *Id.* at 57. Respondents argue that *LaForest* is not applicable here because, in

that case, the district court issued a preliminary injunction only after it had found for the

plaintiffs on the issue of liability. (Dkt. 50 at 32). Although the Second Circuit considered

the procedural posture in *LaForest* "relevant," it did not hold that the prior finding of

liability was determinative with respect to whether the district court properly permitted the

plaintiffs "to adduce evidence of harm representatively." 376 F.3d at 57-58. The Second

Circuit stated that plaintiffs "should" be permitted to do so as "long as they lay a foundation

that the representative plaintiffs are similarly situated with regard to the issue of irreparable

harm." *Id.* at 58. Respondents do not cite any authority that confines *LaForest* to the

narrow application posited in their memorandum of law, and Respondents' attempt to

distinguish *LaForest* is unpersuasive.

    *LaForest* recognized a divergence of opinion among courts that have considered

whether an appropriate foundation was laid for reliance on alleged irreparable harm to

putative class members. *Id.* (citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir.

2000), and *United Steelworkers v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987)). The Second

Circuit left open the issue concerning the governing approach, but indicated that

"[d]etermining whether plaintiffs have laid such a foundation is a case-sensitive inquiry

subject to review for abuse of discretion." *Id.*; *cf. Gardner v. CAN Fin. Corp.*, 3:13 CV

1918 (JBA), 2016 WL 96141, at *8 (D. Conn. Jan. 8, 2016) (discussing different

approaches among courts in determining evidentiary proof required to demonstrate

irreparable harm among putative class members, and concluding "this is not an appropriate

situation in which to issue a broad preliminary injunction prior to the class being certified because plaintiffs have failed to provide adequate evidence that the putative class members are suffering from the irreparable harm that plaintiffs are alleging").

In this case, after considering the motion for class certification and Respondents' opposition, and while recognizing that the motion remains undecided, the Court finds that class certification is likely based upon a consideration of factors set forth in Federal Rule of Civil Procedure 23. Furthermore, the Court concludes that the irreparable harm alleged by the putative class members should be considered when assessing Petitioners' request for a preliminary injunction because the motion papers establish that the asylum-seekers who have been held in Batavia are similarly situated.

Specifically, this Court finds that Petitioners are likely to satisfy the Rule 23(a) prerequisites for class certification: "numerosity, commonality, typicality, and adequacy of representation." *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 80 (2d Cir. 2015). Petitioners proposed class is sufficiently numerous, and Respondents have not disputed that point. (Dkt. 55 at 15 n.2). While Respondents challenge the commonality and typicality requirements, they largely base their opposition on their merits-based challenges to the underlying claims (*id.* at 18-24), which have been rejected by this Court, as discussed above. Respondents also contend that Petitioners' claims require individualized factual determinations and Petitioners cannot establish that common facts apply to each purported class member. (*Id.* at 21-22). That argument misconstrues the relief sought by Petitioners, which is not an individualized determination as to whether to grant parole or bond, but rather a request that certain procedural protections be applied across-the-board when

making those individualized determinations. *See Wal-Mart Stores, Inc. v. Dukes*, 131 U.S. 338, 349-50 (2011) (commonality is satisfied where even a single issue of law or fact is common to the class, and where a classwide proceeding is capable of "generat[ing] common answers apt to drive the resolution of the litigation."); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("The claims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members."); *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 576 (N.D.N.Y. 2017) (typicality requirement satisfied because the claims of the class representatives and the members of the class and subclass were "based on the common application of certain challenged policies." (citing *Sykes*, 285 F.R.D. at 287)).

With respect to the adequacy of the class representative, Petitioners propose only Barrios Ramos as class representative. (Dkt. 19-1 at 17 n.7). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Respondents argue that Barrios Ramos is not an adequate representative because he has been released to parole and his asylum proceeding has been transferred to another district. (*See* Dkt. 55 at 16-18).

According to Respondents, Barrios Ramos will be unable to vigorously pursue the class claims because his claims have been mooted and he is no longer a part of the class he seeks to represent. (*Id.* at 18). As discussed above, Barrios Ramos' individual claims fall within the voluntary cessation exception to the mootness doctrine. However, even if his individual claims were moot, this would not adversely affect the class action claims or Barrios Ramos' capacity to continue litigating the class claims on behalf of the putative class and subclass because the inherently transitory doctrine applies, as also discussed above.

The individual and class claims are readily susceptible to exceptions to the mootness doctrine, which only further buttresses the justification for class certification. *See Wagafe v. Trump*, No. 17-CV-0094 (RAJ), 2017 WL 2671254, at *15 (W.D. Wash. June 21, 2017) ("[The d]efendants' argument that the mooting of named [p]laintiffs' claims requires a finding that they are inadequate representatives, thus defeating class certification, does not have the desired effect. In fact, it counsels in favor of granting class certification."); *Goetz*, 728 F. Supp. at 1004.

Furthermore, the principles underlying the inherently transitory exception suggest that substitution of a new class representative is not required, even when the individual claims are moot. *See White*, 559 F.2d at 857-58 (permitting the class representative to continue litigating the class claims even after his individual claims were rendered moot); *In re Thornburgh*, 869 F.2d 1503, 1509 n.7 (D.C. Cir. 1989) (recognizing that "[s]ome courts . . . have permitted the original named plaintiffs to represent the class even after their own claims were mooted prior to certification," but suggesting "that such treatment is proper only in special circumstances, such as where the alleged law violation is capable of

repetition, yet evading review"). The core rationale of the inherently transitory exception

is that the viability of the class action should not be tied to the viability of individual claims

that may be rendered moot prior to class certification due to their inherent fluidity. Indeed,

if Petitioners are required to name new representatives every time an individually-named

party is released from custody, there is nothing stopping Respondents from attempting to

moot this case by targeting each class representative for parole. *See White*, 559 F.2d at

857; *Goetz*, 728 F. Supp. at 1004.

      Therefore, even if Barrios Ramos' individual claims are extinguished, he may still

be eligible to carry the mantle of class representative for the time being. *See Monaco v.

Stone*, 187 F.R.D. 50, 60 (E.D.N.Y. 1999) (applying the "inherently transitory" exception

and stating that "plaintiff Gregory Monaco may still act as the named representative for the

proposed plaintiff class despite the loss of his individual claims[, because a] named

plaintiff may still litigate a class action despite the loss of their personal stake if the claims

are 'capable of repetition, yet evading review.'" (quoting *Geraghty*, 445 U.S. at 398)); *cf.

Swan v. Stoneman*, 635 F.2d 97, 102 n.6 (2d Cir. 1980) (rejecting the argument that "the

absence of any intervenor or substitute named plaintiff" would not moot the class claim

because, among other things, *Geraghty* did not apply). Respondents rely on two cases

where the courts found inadequate representation once the named representative was no

longer part of the class he sought to represent. *Norman v. Conn. State Bd. of Parole*, 458

F.2d 497, 499 (2d Cir. 1972); *Kenavan v. Empire Blue Cross & Blue Shield*, No. 91-CV-

2393 (KMW), 1996 WL 14446, at *4 (S.D.N.Y. Jan. 16, 1996), *aff'd sub nom. Schmookler*

*v. Empire Blue Cross & Blue Shield*, 107 F.3d 4 (2d Cir. 1997). However, these cases are inapposite as they do not apply either of the exceptions to mootness discussed here.

Of course, when the Court issues a decision on the motion to certify it "must assure itself that the named representative will adequately protect the interests of the class." *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Basel v. Knebel*, 551 F.2d 395, 397 n.1 (D.C. Cir. 1977) ("Whether or not the challenged regulations raise a live controversy with regard to appellant's individual claim, it is clear that a live controversy exists with regard to class members who are currently being denied prior hearings as a result of the regulations. Of course, in order for appellant to serve as the class representative, the district court must assure itself that [she] will adequately represent the interests of the class." (internal quotation marks omitted)). Accordingly, Petitioners may be required to substitute a member of the putative class as the class representative if the Court determines that Barrios Ramos' representation "will [not] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

However, at this stage of the proceedings, the Court concludes that class certification is likely and, as a result, Petitioners should be permitted to adduce evidence of harm representatively.[10] For the reasons set forth below, the Court finds that the

---

[10]    In addition to likely meeting the requirements of Rule 23(a), the Court concludes that Petitioners will also likely be able to demonstrate that Respondents have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (internal quotation marks and citation

individuals who have submitted sworn declarations in support of the preliminary injunction motion have established a strong showing of irreparable harm, and the harms those individuals face are representative of prospective class members generally. Accordingly, the Court will consider the application for preliminary injunctive relief in the context of the putative class members as a whole.

### B.      Irreparable Harm

The most important prerequisite to issuing a preliminary injunction is irreparable harm. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Plaintiffs seeking preliminary injunctive relief must affirmatively "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "The movant is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied.'" *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531

---

omitted). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of the types of actions authorized by Rule 23(b)(2). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Although an evaluation of each putative class member's situation may produce circumstances unique to their particular detention, Petitioners have demonstrated deficiencies in the procedures employed by Respondents that "stem from central and systemic failures" and apply across-the-board to each putative class member. *See Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) ("Defendants further claim that due to the unique circumstances of each plaintiff's experience with the child welfare system, the defendants have not acted on grounds generally applicable to the class. We disagree. Insofar as the deficiencies of the child welfare system stem from central and systemic failures, the district court did not abuse its discretion in certifying a 23(b)(2) class at this stage of the litigation.").

(S.D.N.Y. 2004) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

### 1.    Sworn Declarations Submitted by Petitioners

Based on the record before the Court, Petitioners have established irreparable harm through the negative physical and mental health effects of prolonged detention and the fact that their continued detention has prevented putative class members from adequately preparing for their asylum hearings before an immigration judge.    In support of their motion, Petitioners have attached numerous declarations detailing the ways that Respondents have violated the ICE Directive and the harm caused by the ongoing violations.    Many of these putative class members affirm that they have been detained at the Buffalo Federal Detention Facility for months at a time. (*See, e.g.*, Dkt. 38-4 at 3 (since February 2017); Dkt. 38-5 at 4 (since October 2016); Dkt. 38-6 at 2 (since January 2017); Dkt. 38-7 at 2 (since February 2017); Dkt. 38-8 at 2 (since May 2017); Dkt. 38-9 at 3 (since December 2016, and did not receive a credible fear interview until two months later); Dkt. 38-10 at 2 (since December 2016); Dkt. 38-11 at 2 (since January 2017); Dkt. 38-12 at 2 (since January 2017); Dkt. 38-13 at 2 (since October 2016); Dkt. 38-14 at 2 (since January 2017); Dkt. 38-15 at 2 (since January 2017); Dkt. 38-16 (from February 2017 to September 2017 when he was released)).    The "average length of detention" for the detainees who allegedly form the putative subclass is 387 days, with the longest-recorded detention being 1,057 days. (Dkt. 51-1 at 2; *see id.* at 11 (since January 2017), 19 (since November 2016), 29 (since December 2016), 35 (since October 2016), 46 (since January 2017), 51 (since October 2016), 59 (since September 2016), 86 (since December 2016)).    Having already

determined that § 1225(b) contains an implicit time restriction requiring Respondents to hold a bond hearing for detained asylum-seekers after six months of confinement, the Court further concludes that the continued detention of these individuals for such prolonged durations directly contravenes this implied statutory right and constitutes irreparable harm.

The putative class members allege that they have been denied multiple requests for parole via perfunctory form denials, despite the fact that several declarants allege that they provided ICE with sufficient documentation. (Dkt. 38-4 at 3-4; Dkt. 38-5 at 5-6; Dkt. 38-6 at 3; Dkt. 38-7 at 3; Dkt. 38-8 at 3; Dkt. 38-9 at 3-4; Dkt. 38-10 at 3; Dkt 38-11 at 3; Dkt. 38-13 at 3; Dkt. 38-15 at 3; Dkt. 38-16 at 3; *see also* Dkt. 51-1 at 11-17, 20, 24, 27, 29-30, 33, 35-36, 51-52, 70-71). Furthermore, many declarants also aver that those form denials did not adequately explain the deficiencies in their applications or what documentary materials would be sufficient. (*See* Dkt. 51-1 at 12, 20, 30, 52, 60, 71). The ICE Directive requires Respondents to provide "a brief explanation of the reasons for any decision to deny parole." ICE Directive No. 11002.1, ¶ 6.5. The Directive also requires that the letter notification inform the individual that "he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding." *Id.* "[A]bsent reasonable justification for delay," written decisions are to be provided to the alien within seven days of the parole interview or the requested redetermination decision. ICE Directive No. 11002.1, ¶ 6.6.

The Court has reviewed numerous two-sentence form denials issued by Respondents that were submitted as part of Petitioners' papers. These letters do not provide a meaningful "explanation" setting forth "the reasons for denying parole." ICE Directive

No. 11002.1, ¶ 6.5. Since each individual's application is analyzed "on its own merits and based on the facts of the individual alien's case," *id.* ¶ 6.2, blanket denials that forgo explaining the specific deficiencies in an individual's application is a derogation of the requirements of the ICE Directive.

Indeed, many of Petitioners' declarants allege that they were *never* provided with any paperwork explaining how to seek parole, and a number of those who were provided paperwork were not English speakers and did not receive the documents in their native languages. (Dkt. 38-6 at 3; Dkt. 38-7 at 2-3; Dkt. 38-8 at 2; Dkt. 38-9 at 3-4; Dkt. 39-10 at 2; Dkt. 38-12 at 2; Dkt. 38-15 at 3; *see also* Dkt. 51-1 at 11, 19, 46, 59). Pursuant to the ICE Directive, ICE "shall provide" an arriving alien with a "Parole Advisal and Scheduling Notification" "[a]s soon as practicable following a credible fear determination." ICE Directive No. 11002.1, ¶ 6.1. That form is intended to inform the alien that he or she "will be interviewed for potential parole . . . and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole." *Id.* Furthermore, the notification "shall be explained to such aliens in a language they understand." *Id.*

In addition, several declarants further aver that their prolonged detention substantially burdened their ability to adequately prepare for an asylum hearing before an immigration judge. (*See* Dkt. 38-6 at 3; Dkt. 38-7 at 3; Dkt. 38-10 at 3; Dkt. 38-12 at 3; Dkt. 51-1 at 12, 30, 60). Detention under § 1225(b) is intended only as a temporary measure pending further review of the detainee's asylum application by an immigration judge. *See* 8 U.S.C. § 1225(b)(i)(B)(ii) ("[T]he alien shall be detained for further

consideration of the application for asylum."). The prolonged nature of these detentions has limited the detainees' capacity to contact friends and family in their native countries. The restrictions have hampered the detainees' preparation for upcoming asylum hearings, which undermines the very purpose of providing asylum-seekers a hearing. *See Celestin*, 17 Civ. 2419, slip. op. at 5-6 (bench decision finding that administrative exhaustion was not required where the alien detainee was likely to suffer irreparable harm because "he [was] deprived of his liberty and specifically s[ought] relief from detention so that he c[ould] gather evidence for his asylum hearing," and noting that the communication challenges he faced while detained made it difficult to prepare for the hearing).

Many putative class members also allege various physical and psychological impairments that have resulted from or worsened due to their prolonged confinement. (*See* Dkt. 38-4 at 4 ("I have been diagnosed with PTSD."); Dkt. 38-5 at 6 (noting "anxiety and depression" and "trouble breathing"); Dkt. 38-11 at 2-3 (noting several hospitalizations for significant ear pain, and "no hearing in [his] right ear and a lot of pain in [hi]s left ear, because the eardrum is perforated and infected"); Dkt. 38-12 at 3 (noting asthma and "breathing problems and so much pain in [his] knees that [he] cannot stand," as well as "very bad headaches that make [him] dizzy and give [him] nose bleeds"); Dkt. 38-15 at 3 (noting a "hernia" and that he has "collapsed from abdominal pain"); Dkt. 51-1 at 12 (noting a "fractured bone in [his] hand" and that he is suffering from a "serious" condition of "thrombosis")). The allegations by Petitioners and members of the putative class of diminished physical and mental health conditions constitute significant burdens upon the detainees' well-being. *See Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)

(recognizing that immigration detention provides only "subpar medical and psychiatric care" and yields "economic burdens [that are] imposed on detainees and their families[, and] . . . collateral harms to children of detainees whose parents are detained"); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (finding that the plaintiff's "sworn statement that he suffers from headaches, hair loss, rashes, and an inability to walk without difficulty" indicated that he "has suffered physical effects of his confinement" and this "serve[d] as an independent basis" to establish the likelihood of irreparable harm).

Lastly, it is worth noting that Petitioners do not seek monetary judgments; rather, they ask to receive the full and fair process afforded to them under the law—procedural rights unduly denied them as detainees of the Buffalo Federal Detention Facility. *See Jarpa v. Mumford*, 211 F. Supp. 3d 706, 711 (D. Md. 2016) ("[B]ecause the harm is loss of liberty, it is quintessentially the kind of harm that cannot be undone or totally remedied through monetary relief."); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (finding irreparable harm because the "injuries at stake . . . are 'beyond remediation,'" and noting that "[u]nlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact").

### 2. Respondents' Declarations Do Not Create Meaningful Issues of Fact

Respondents have submitted several declarations from ICE officials that contradict various allegations in Petitioners' declarations. Deportation Officers Ensminger, McCartan, and Muehlig deny discouraging any detainee from seeking parole or stating that parole was no longer available. (Dkt. 50-3 at 2-7; Dkt 50-4 at 2; Dkt. 50-5 at 2). Officer

Ensminger also contradicts the declaration of Attorney Desiree Lurf. Attorney Lurf alleges, in her declaration, that Officer Ensminger informed her that the parole adjudication practices at the Buffalo Federal Detention Facility had changed under the new administration. (Dkt. 38-19). Officer Ensminger states that he never informed Attorney Lurf that parole practices had changed. (Dkt. 50-3 at 7). Similarly, Officer Ball states that he does "not believe that [he] told [immigration attorney Siana McClean] the parole policy had changed." (Dkt. 50-1 at 1-2; *see* Dkt. 38-18 at 3 (stating that Officer Ball "informed [her] that parole adjudication practices have changed under the new administration")).

The officers also state that they provided Petitioners' declarants with information about how to apply for parole (Dkt. 50-3 at 2; Dkt. 50-4 at 2; Dkt. 50-5 at 1) and forwarded parole requests on behalf of those individuals (Dkt 50-3 at 2; Dkt. 50-5 at 2). They contend that the Buffalo Federal Detention Facility has simply begun to scrutinize parole documentation more closely. (Dkt. 50-1 at 1 (indicating that he informed Attorney McLean "that we are now more closely scrutinizing the validity of . . . documents that are provided for consideration in the parole decision . . . based on a general consensus . . . about the parole process, our interpretation of Thomas Brophy's remarks regarding identity documents, as well as the changes in the general enforcement objectives under the Trump Administration"); Dkt. 50-3 at 7 (indicating that he informed Attorney Desiree Lurf "that the requirements for parole are being scrutinized more thoroughly than in the past, as directed by the new acting Field Office Director"); Dkt. 50-5 at 2-3 (indicating that he informed a detainee that "it was possible with the new administration that the requirements for release on parole have tightened up")).

Although Respondents' declarations specifically contradict some of the factual allegations in the declarations submitted by Petitioners, Respondents never represent that they are adhering to the requirements of the ICE Directive. Indeed, Respondents' position is that the ICE Directive is not legally binding. Nor do Respondents' declarants contradict Petitioners' allegations regarding the diminishing mental and physical health of the putative class members, or the negative impact that detention has on the ability to prepare for asylum proceedings.

Acting Field Office Director Thomas Brophy asserts that parole practices did not change once President Trump came into office. (Dkt. 50-2 at 1). However, he does not state that the Buffalo Federal Detention Facility was following the ICE Directive before January 2017, or that it is following the Directive today. Director Brophy also affirms that he uses "standard language in letters to attorneys when denying parole" and a "Notification Declining to Grant Parole" to notify detainees. (*Id.* at 1-2). Even so, Petitioners have provided photocopies of parole denial letters given to Petitioners and the members of the putative class, and many of those letters indisputably fail to conform to the requirements of paragraph 6.5 of the ICE Directive. That paragraph provides that officers "shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole." Many of Petitioners' declarants received letters notifying them that their parole request had been denied without explanation. (*See, e.g.*, Dkt. 38-6 at 6; Dkt. 38-7 at 7; Dkt. 38-9 at 7; Dkt. 38-10 at 6; Dkt. 38-11 at 7; Dkt. 38-13 at 7; Dkt. 38-15 at 7; Dkt. 38-20 at 11).

Director Brophy's declaration also states that the Buffalo Federal Detention Facility has eliminated its practice of accepting photocopies of government-issued identification, contending that the heightened scrutiny falls within the "spirit" of the ICE Directive. (*Id.* at 2-3). However, the ICE Directive plainly allows for alternatives to government-issued identification for individuals who "cannot reasonably provide valid government-issued evidence of identity" and contains no language requiring original documents. ICE Directive No. 11002.1, ¶ 8.3(1).

Accordingly, Respondents' declarations do not create issues of fact concerning the failure to adhere to the requirements of the ICE Directive, the impairment that the prolonged detention of the putative class members has had on their ability to prepare for their asylum proceedings, and the impact of detention on the putative class members' physical and mental health. Moreover, there is no dispute that individualized bond hearings are not afforded to asylum-seekers after six months of detention, as Respondents contend they are not required for § 1225(b) detentions.

### 3. Petitioners Have Established Irreparable Harm

The uncontested factual allegations demonstrate that, absent a preliminary injunction, Petitioners and the putative class members "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66. Those submitting declarations in support of the preliminary injunction motion face harms that are representative of prospective class members generally. Those harms include the negative physical and mental health effects of prolonged detention and the fact

that their continued detention has prevented putative class members from adequately preparing for their asylum hearings before an immigration judge.

Of course, mandatory detention provisions in the immigration context are constitutionally permissible, *see Demore v. Kim*, 538 U.S. 510, 531 (2003), but that fact does nothing to diminish the crux of Petitioners' claims of an unlawfully "prolonged" and allegedly indefinite detention. *See Lora*, 804 F.3d at 616 (holding that § 1226(c) contains an implicit time restriction to avoid "serious constitutional concerns" attendant to an alien's indefinite detention); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) (holding that § 1225(b)(1)(B)(ii) and (b)(2)(A) do not permit indefinite detention); *see also Demore*, 538 U.S. at 532-33 (Kennedy, J., concurring) ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons.").

Indeed, Petitioners do not argue that they cannot be detained at all; rather, Petitioners take issue with the manner in which they have been detained—indefinitely and without fair process. Petitioners' request, ultimately, asks this Court to require Respondents to adhere to their policies and procedures. That remedy would cure the alleged violations. *See, e.g., Hernandez*, 2017 WL 4341748, at *13; *Rodriguez II*, 715 F.3d at 1145; *Jarpa*, 211 F. Supp. 3d at 711; *R.I.L-R*, 80 F. Supp. 3d at 191. Accordingly, the scope of the requested preliminary injunctive relief is appropriate.

## C.  Likelihood of Success on Bond Hearing Claims

Respondents also argue that Petitioners are not substantially likely to succeed on the merits of their bond hearing claims because neither *Lora* nor *Rodriguez II* applies in this case. (Dkt. 50 at 26-31). As already discussed, the Court disagrees with Respondents' position for the reasons stated above in the section addressing Respondents' Rule 12(b)(6) motion to dismiss. Here, Petitioners have provided numerous declarations averring that members of the putative class have been detained at the Buffalo Federal Detention Facility for six months or more without a bond hearing. Respondents have not disputed this fact.

At oral argument, Petitioners and Respondents described the bond claims as presenting a legal issue, and the Court agrees with that characterization. Therefore, since Petitioners have provided the declarations of many detainees who are entitled to the six-month limitation in § 1225(b), and Respondents have failed to set forth any facts weighing against the application of that implicit time restriction, the Court determines that Petitioners are likely to prevail on their bond hearing claims. Again, the Court acknowledges that the Supreme Court is poised to address this issue in *Jennings v. Rodriguez*, No. 15-1204 (U.S. argued Nov. 30, 2016), and the outcome of that case could change the legal landscape in this area. However, at this time, based on the law in this Circuit, the Court concludes that Petitioners have established a likelihood of success on their claims to a bond hearing.

Respondents also briefly argue that 8 U.S.C. § 1252(f)(1) precludes class-wide injunctive relief for Petitioners' bond claims. Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the

provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

*Id.* As Respondents note, the Supreme Court has stated that "[b]y its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481-82 (1999).

However, contrary to Respondents' assertions, § 1252(f)(1) is inapplicable to Petitioners' request for relief. Where, as here, the moving party "does not seek to enjoin the operation of §§ 1221-1231," and instead, seeks to enjoin violations of the statutory and regulatory framework, the class-wide prohibition on injunctive relief is inapplicable. *Grimaldo v. Reno*, 187 F.R.D. 643, 648 (D. Colo. 1999); *see Rodriguez I,* 591 F.3d at 1120 ("Section 1252(f) prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes."); *R.I.L-R*, 80 F. Supp. 3d at 184 (determining that § 1252(f)(1) "poses no bar to relief" where the class-wide injunction would "merely enjoin conduct that allegedly violates [§ 1226(a)]"); *Tefel v. Reno*, 972 F. Supp. 608, 618 (S.D. Fla. 1997) ("Plaintiffs do not seek to enjoin the statute. They seek to enjoin constitutional violations and policies and practices of the Defendants that result in pretermission and deportation."); *see also Gordon v. Johnson*, 300 F.R.D. 31, 40 (D. Mass. 2014) ("[T]he court need not prohibit the operation of any part of the law to correct the government's incorrect application of it.").

In order to avoid "serious constitutional concerns," the Court has construed § 1225(b) to contain a six-month time restriction for detentions permitted under its provisions without a bond hearing. Petitioners seek to enjoin Respondents' failure to adhere to this implied statutory term, and request that the Court remedy this violation by requiring Respondents to afford individualized bond hearings to those asylum-seekers who have been detained for six months or more. Because Petitioners do not seek to enjoin the operation of the statute, but rather Respondents' violation of this implicit term, § 1252(f)(1) does not bar the requested class-wide injunctive relief.

### D.    Likelihood of Success on Parole Claims

For the reasons set forth above in the discussion of Respondents' motion to dismiss, the Court concludes that Respondents are required to comply with the ICE Directive when considering applications for parole. Moreover, as discussed above in connection with the issue of irreparable harm, Petitioners have alleged sufficient uncontested facts to establish ongoing violations of the ICE Directive. While the extent of the violations and the underlying reasons for the violations may be disputed, Respondents have not offered facts contradicting the allegations that the ICE Directive has not been followed—indeed, Respondents' position (at least before this Court) is that the ICE Directive is not binding.

As discussed in the context of the motion to dismiss, the ICE Directive plainly sets forth individual rights in the context of parole determinations, and the *Accardi* doctrine requires that those internal directives be followed. Respondents told the Supreme Court that the ICE Directive was being followed, and their attempts before this Court to disclaim any obligation to follow that Directive are, to say the least, unpersuasive.

- 63 -

E.    **Public Interest and the Balance of Equities**

Petitioners ask the Court to follow the Ninth Circuit and hold that the public interest "benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions." *Rodriguez II*, 715 F.3d at 1146. Petitioners also contend that the "balance of the equities" tips in their favor. *Schneiderman*, 787 F.3d at 649. In *Rodriguez II*, the court held that the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute to avoid constitutional concerns." 715 F.3d at 1145.

Here, as in *Rodriguez II*, the only potential harm suggested by Respondents is that the order would enjoin "presumptively lawful government activity" and would be "contrary to the plain meaning of the statutes." *Id.* Respondents argue that a preliminary injunction on Petitioners' parole claims is not in the public interest because the public's interest in enforcement of U.S. immigration laws is paramount. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975). According to Respondents, to disregard a statutory mandate that makes parole decisions discretionary cannot be in the public interest.

Again, Respondents' position misconstrues the relief sought by Petitioners. Granting preliminary injunctive relief will simply require Respondents to comply with their legal obligations and afford Petitioners procedural protections in connection with Respondents' exercise of discretion. Under *Lora*, Respondents must provide bond hearings to individuals detained under § 1225(b) for more than six months. Furthermore, contrary to Respondents' assertions, ordering compliance with the terms of the ICE Directive is consistent with Second Circuit case law and will not obviate the discretionary

- 64 -

aspect of parole decisions. Respondents have affirmatively represented to the Supreme Court that they are following the ICE Directive and that it remains in full force and effect. Under the circumstances, this Court is hard-pressed to see how requiring compliance with an internal directive that Respondents so readily embraced before the Supreme Court could be against the public interest. Granting the preliminary injunction will not compel Respondents to release any detainees on parole or bond. Rather, it simply means that certain procedural safeguards must be followed when considering the detention of these individuals. As a result, the Court concludes that the balance of equities tips in favor of Petitioners and the public interest is served by an injunction.

## F.    Preliminary Injunction

Respondents are hereby ordered to immediately adjudicate, or, in cases where there is a prior denial of parole, readjudicate the parole applications of all members of the putative class,[11] in conformance with their legal obligations, including their obligations under the ICE Directive, including by providing each arriving asylum-seeker an advisal setting forth the requirements to obtain parole; a translation of that information into a language understood by the asylum-seeker; a parole interview with an immigration officer; an individualized explanation of any denials; and notification of the opportunity to seek reconsideration, consistent with the requirements of the ICE Directive.

---

[11]    The "putative class" is as follows: All arriving asylum-seekers who have passed a credible fear interview and who are or will be detained at the Buffalo Federal Detention Facility in Batavia, New York, and who have not been granted parole.

In addition, Respondents are also ordered to provide members of the putative class who have been detained for six months or more with individualized bond hearings, in conformance with the Second Circuit's decision in *Lora*. At oral argument, Respondents contended that they should not be burdened with the heightened "clear and convincing" evidentiary standard with respect to denial of bond; that is, Respondents assert that they should not have to prove by clear and convincing evidence that an individual is a flight risk or a danger to the community to justify the denial of bond. Respondents argue that the Supreme Court has never imposed such an exacting burden in this context. However, as Petitioners noted, that standard has been imposed by the Ninth Circuit since at least 2013, *see Rodriguez II*, 715 F.3d at 1131, and the Second Circuit has since followed *Rodriguez II* in applying that standard to bond hearing claims arising out of § 1226(c), *Lora*, 804 F.3d at 616. In fact, the district courts in this Circuit that have applied *Lora* to individuals detained under § 1225(b) have also extended the clear and convincing evidentiary standard in this context. *See, e.g.*, *Morris*, 2017 WL 1968314, at *2; *Saleem*, 2016 WL 4435246, at *5; *Arias*, 2016 WL 3906738, at *10.

*Rodriguez II* adopted the clear and convincing evidence standard based on its prior decision in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011), which held that "[g]iven the substantial liberty interest at stake[,] . . . the government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond." *Id.* at 1203. The Court recognizes that the asylum-seekers at issue here enjoy few, if any, constitutional rights under the present state of the law. *See Landon*, 459 U.S. at 32 ("This Court has long held that an alien seeking initial admission to the United

States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative."). Of course, it would also be incorrect to say that these individuals have *no* rights at all. *See Correa*, 901 F.2d at 1171 n.5 (noting that "[r]ights in such circumstances appear to be largely statutorily derived").

In any event, as discussed above, LPRs are subject to the mandatory detention provisions of § 1225(b). When an LPR is involved, the rationale in *Rodriguez II* and *Singh* is particularly compelling given the significant due process liberty interest at stake. As *Clark* noted, the canon of constitutional avoidance applies to avoid an interpretation of a statute that would otherwise raise "serious constitutional doubts." 543 U.S. at 381. Regardless of whether a particular litigant is entitled to invoke due process in his own right, the litigant may invoke the canon of constitutional avoidance "to vindicate his own *statutory* rights." *Id.* at 382. Thus, under *Singh*, Respondents would be required to prove by clear and convincing evidence that continued detention is necessary when the bond applicant is an LPR; therefore, because non-LPRs also have an implicit right to a bond hearing under § 1225(b), the canon of constitutional avoidance requires Respondents to make the same showing when the particular detainee is a non-LPR.

It is worth mentioning that a clear and convincing evidence standard should not be as insurmountable as Respondents portend. Indeed, if Respondents execute their parole authority in accordance with the ICE Directive, there should be little cause for concern. Pursuant to the ICE Directive's provisions, "absent additional factors," arriving aliens who have demonstrated a credible fear of persecution "*should*" be released to parole. ICE Directive No. 11002.1, ¶ 6.2 (emphasis added). By its terms, the ICE Directive encourages

release to parole supervision. To be sure, there will no doubt be occasions where continued detention is strongly desired, and, of course, this decision does nothing to erode the Attorney General's discretionary authority to grant or deny parole. *See* 8 U.S.C. § 1182(d)(5)(A). However, if Respondents follow the ICE Directive, individuals who are not likely to be a flight risk or a danger to the community will have been released on parole before six months have passed. Where an individual is detained for six months, Respondents should, under the ICE Directive, have a good reason for the continued detention and should therefore be able to readily meet the clear and convincing evidence standard of proof with respect to the denial of bond. Conversely, if Respondents are unable to meet their burden at the bond hearing, that failure should indicate that parole would have been appropriate at an earlier time.

## CONCLUSION

For the foregoing reasons, Respondents' motion to dismiss (Dkt. 27) is denied, and Petitioners' motion for a preliminary injunction (Dkt. 38) is granted.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: November 17, 2017
Rochester, New York